UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 07-22670 CIV-SEITZ/MCALILEY

STOCKWIRE RESEARCH GROUP, INC.
a Florida corporation, and
ADRIAN JAMES, a Texas Resident.

                          **Plaintiffs,**

vs.

JONATHAN LEBED, a Florida resident,
LEBED BIZ, L.L.C., a New Jersey Limited
Liability Company, PIGASA, INC., a New
Jersey Corporation, and CONSTANCE LEBED,
a New Jersey Resident.

                          **Defendants.**
_____/

**PLAINTIFF STOCKWIRE RESEARCH GROUP, INC'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
<u>STATUTORY DAMAGES CALCULATIONS PURSUANT TO 17 U.S.C. § 1203</u>**

        Plaintiff Stockwire Research Group, Inc. ("Stockwire"), pursuant to this Court's Order Contained in the Notice of Evidentiary Hearing on Motion for Default Judgment [DE 77] at 2 ¶ 2, hereby files its Memorandum of Law in Support of Its Statutory Damages Calculations Pursuant to 17 U.S.C. § 1203.

### I.    PRELIMINARY STATEMENT

        Plaintiff Stockwire has been irreparably damaged by the Defendants' unlawful misappropriation of Stockwire's copyrights and Defendants' continued intentional false representation of the Plaintiff Stockwire's Stockumentary as their own. Defendant Jonathan Lebed is an internationally infamous securities fraudster that illegally competes against the legitimate Stockwire in the stock promotion and investor's relation business.

MI1:\109114\01\2C6Y01!.DOC\66024.0029

1
**ASSOULINE & BERLOWE, P.A.**
3250 Mary Street, Suite 308, Miami, Florida 33133 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

Dockets.Justia.com

At issue before the Court, is how to calculate statutory damages for Defendants' illegally posting a pirated version of Plaintiff's 'Stockumentary' video on the popular view on demand website www.Youtube.com, which video later turned out to be downloaded in excess of 12,000 times by different viewers at a times and places of the viewers' choosing. Read in conjunction with its lengthy legislative history, and the case law cited therein, the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. §§ 117, 512, 1201 *et. seq.*, clearly provides statutory damages for each violation of an owner's copyright. In fact, Congress intended to sanction commercial violations and deter mass piracy such as is at issue in this case.

While the Court has indicated concern with the holding found in *McClatchey v. Associated Press*, 2007 WL 1630261 (W.D. Pa. Jun 4, 2007), the facts relied on in *McClatchey* are distinguishably different than those in this case. Here, the Defendants repeatedly directed and continuously controlled the copying and the DMCA violations (both under § 1201 and § 1202). The *McClatchey* case was limited to an instance where there was a <u>single broadcast</u> of one § 1202 violation. Both the *McClatchey* opinion, and the case law that has followed, has expressly distinguished such single broadcast distribution from <u>*variable distribution*</u>. In fact, the *McClatchey* court found that it was not in dispute that violations occurring at separate times were entitled to multiple damages, and awarded two separate statutory damages for the two instances of *variable distribution* pled in that case. *McClatchey*, 2007 WL 1630261 at *5-6.

Unlike *McClatchey*, Stockwire has sought damages for *variable distributions* and repeated acts from the Defendants, and not any subsequent "downstream" distribution from their subscribers. In other words, Stockwire has not sought statutory damages for multiple viewers watching the same copy of the Pirated Product at same time during the same distribution (e.g. A, B, C and D all watch the same performance of the Pirated Product with popcorn at A's house),

MI1:\109114\01\2C6Y01!.DOC\66024.0029

2

**ASSOULINE & BERLOWE, P.A.**
3250 Mary Street, Suite 308, Miami, Florida 33133 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

but rather has sought damages for each of the independent copies made and sent by Defendants directly to multiple individual viewers at their respective computer locations, and viewed at different times of their own individual choosing.[1] The *McClatchey* holding (which is not binding on this court) relates to a single transmission of violative/false Copyright Management Information ("CMI"). *McClatchey* was decided under different facts and circumstances and is not applicable in the present case. Consequently, as explained more fully below, each "view" of different copies of the pirated video (i.e., each download) is a violation worthy of its own statutory damages under the DMCA, and the Court should award damages consistent therewith.

## II. MEMORANDUM OF LAW

### A. The Digital Millennium Copyright Act Provides for Statutory Damages For Each Instance Where the Defendants Violated the Integrity of Stockwire's Copyright Management Information or Stockwire's Technical Protection Measures.

The Digital Millennium Copyright Act provides statutory damages where a person violates a copyright holder's technical protection measures or copyright management information. *See* 17 U.S.C. §§1201-1203. There are two types of technical protection measures: (i) 'access' based measures under § 1201(a); and, (ii) 'rights' based measures under § 1201(b). The 'access' based technical protection measures are those measures that effectively control access to a work when in the ordinary course of the measure's operation, the measure ". . . requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3)(B). The § 1201(b) 'rights' based technical protection measures are those measures that effectively protect a right of a

---

[1] Variable distribution of media content over the Internet is analogous to the view-on-demand features many cable and satellite television viewers use when they view a movie of their choice, at a time of their choosing, in their home, and with no other subscriber being able to see the performance of the ordering subscriber's chosen programming.

MI1:\109114\01\2C6Y01!.DOC\66024.0029

3

**ASSOULINE & BERLOWE, P.A.**
3250 Mary Street, Suite 308, Miami, Florida 33133 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

copyright owner when in the ordinary course of the measure's operation, ". . . prevents, restricts, or otherwise limits the exercise of a right of a copyright owner." 17 U.S.C. § 1201(b)(2)(B). Copyright Management Information includes, *inter alia*:

    (1)    The title and other information identifying the work, including the information set forth on a notice of copyright.

    (2)    The name of, and other identifying information about, the author of a work.

    (3)    The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

    (4)    With the exception of public performances of works by radio and television broadcast stations, the name of, and other identifying information about, a performer whose performance is fixed in a work other than an audiovisual work.

    (5)    With the exception of public performances of works by radio and television broadcast stations, in the case of an audiovisual work, the name of, and other identifying information about, a writer, performer, or director who is credited in the audiovisual work.

    (6)    Terms and conditions for use of the work.

    (7)    Identifying numbers or symbols referring to such information or links to such information.

    (8)    Such other information as the Register of Copyrights may prescribe by regulation, except that the Register of Copyrights may not require the provision of any information concerning the user of a copyrighted work.

17 U.S.C. § 1202. The case law evaluating how statutory damages should be calculated with respect to technical protection measures and copyright management information has been slow to develop, and has been, in some instances, difficult to reconcile from case-to-case.

        In this regard, *sua sponte*, the Court has raised *McClatchey* as a case that possibly would support an award of statutory damages in this matter for each time the Defendants

MI1:\109114\01\2C6Y01!.DOC\66024.0029

4

**ASSOULINE & BERLOWE, P.A.**
3250 Mary Street, Suite 308, Miami, Florida 33133 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

unlawfully <u>posted</u> the pirated work for distribution. However, as explained more fully below, *McClatchey* does not stand for this proposition, and *McClatchey* is consistent with the measure of statutory damages Plaintiffs' seek to impose, which is based upon each download of the Pirated Product (defined in § A(1), *infra*.).

### 1. *McClatchey* Supports Awarding Separate Statutory Damages Under the CMI Provisions of the DMCA for Each Instance Where an Infringed Work is Provided to a Third-Party.

The *McClatchey* facts are decidedly different than the case at bar. In the *McClatchey* case, Ms. McClatchey had taken a picture of the smoke seen from her backyard after United Airlines Flight 93 crashed in Pennsylvania during the terrorist attacks on September 11, 2001. *McClatchey v. Associated Press*, 2007 WL 1630261, at *1. Later, Ms. McClatchey approached a person from the Associated Press (the "AP"), who interviewed her on the one year anniversary of the terrorist attacks, September 11, 2002, regarding the picture that she taken the year before. *Id.* at *1. To follow up with the story, a photographer from the AP returned to Ms. McClatchey's home later that day and took a photograph of the picture (the "AP Copy"). *Id.* at *2. Then AP **broadcast** the AP Copy to its subscribers in a **<u>single transient transmission</u>**, which was simultaneously archived in AP's "PhotoArchive." *Id.* at *6.

After receiving the original broadcast transmission, AOL requested a copy of the AP Copy from the PhotoArchive, which AOL used on its home page. *Id*. at *2, and *6.[2] Ms. McClatchy subsequently sued AP for the apparent 1,147 subscribers to its single broadcasted news feed, as they were intended recipients of initial transmission of the photograph. *Id.* The

---

[2] *See also*, Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1, *McClatchey v. Associated Press* Civ-05-145J (W.D. Pa. 2007); Plaintiff's Objections and Responses to Defendant's Statement of Undisputed Material Facts, *McClatchey v. Associated*

MI1:\109114\01\2C6Y01!.DOC\66024.0029

5

**ASSOULINE & BERLOWE, P.A.**
3250 Mary Street, Suite 308, Miami, Florida 33133 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

Pennsylvania trial court found that the single broadcast of the photo was a single distribution of the photograph regardless of the number of viewers. *Id.* at *6. The Court justified this decision because it concluded that "Congress would not have intended to make the statutory damages windfall totally independent of the Defendant's conduct."[3]

Yet, **the *McClatchey* court expressly held that it was not deciding whether the distribution to AOL through AP's PhotoArchive would be a third violation.** *McClatchey* at *5 fn 2. The court found that such a finding was unnecessary as **AP had already conceded that the distribution to AOL through the AP PhotoArchive was an additional violation**. *Id.*

Similarly, over the course of nine or more months, Defendants on multiple times offered, provided, and distributed Stockwire's highly produced multimedia presentation absent its copyright management information and technical protection measures (the "Pirated Product"). Defendants intentionally induced multiple third-parties to separately request and receive from Defendants copies of the Pirated Product. It was Defendants' clear intention that the hacked-up Pirated Product would appear as though it was produced by Stockwire or with Stockwire's endorsement. The Pirated Product was distributed directly by Defendants at different times to multiple users that directly connected either to Defendants' Youtube pages or to Defendants'

---

*Press* Civ-05-145J (W.D. Pa. 2007); and Plaintiff's Statement of Undisputed Material Facts, *McClatchey v. Associated Press* Civ-05-145J (W.D. Pa. 2007).

[3] In reaching its decision to limit the "windfall" that Congress intended to "deter violations of the DMCA," the *McClatchey* Court incorrectly read the "per act" language from §1203(c)(3)(A) into § 1203(c)(3)(B), and relies on that in its decision. *Id.* at *6. There are reported decisions relation to § 1203(c)(3)(A), many of which have awarded multiple damages. *See e.g. Sony Computer Entertainment America, Inc. v. Divineo, Inc.*, 457 F. Supp. 2d 957, 958-67 (N.D. Cal. 2006) (awarding $3,750,200.00 in statutory damages for 10,000 violations plus attorneys fees). The McClatchey analysis is much like limiting a murderer's damages when the murder throws a hand grenade into a crowded theater. Under a McClatchey analysis, the murderer would be sanctioned less for his more efficient matter of killing, rather than if he attacked each victim one by one. Sometimes, one act is calculated to cause multiple damages, and it should be sanctioned accordingly.

MI1:\109114\01\2C6Y01!.DOC\66024.0029

Commercial web site.[4] Such a view-on-demand distribution is known as *variable distribution*, and is not a single isolated act or violation. Defendants' conduct was responsible for each violation. "The DMCA authorizes statutory damages for each instance in which an infringed [work] . . . was provided to a third party." *Goldman v. Healthcare Management Systems, Inc*, 2008 WL 1630261, at *10 (W.D. Mich. Jun 5, 2008) (analyzing, criticizing and then distinguishing *McClatchey* in making a CMI damages analysis). *See also, Propet USA, Inc. v. Shugart*, 2007 WL 3125275 at *3, (W.D. Wash. Oct. 24, 2007) (upholding $1,315,800.0 verdict including $500,000.00 for approximately 200 copies of different photographs distributed without CMI)

Congress intentionally made it very risky for a commercial violator to use copyrighted material when the violator knows that the copyright management information has been intentionally altered or removed to conceal infringement. *See*, § B, *infra*. This is because there is no legitimate reason why an innocent person would alter or remove copyright management information with the intent to conceal "an infringement."[5] These types of damages also may provide access to the courts for parties they may not otherwise be able to afford to litigate their case, and encourage legitimate rights holders to put their creative works on the Internet sooner, and with more iterations.

Reading other limitations into the statutory language proscribed by Congress would go against the clear intention of Congress, which expressly and unambiguously was

---

[4] Plaintiff at this time has only sought damages for the Youtube violations, because Defendant has not cooperated in discovery, and otherwise has refused to provide Plaintiff with an accounting of the many other violations that occurred on Defendants' various web sites.

[5] In fact, only in specific circumstances, is a court is permitted to find that a violation of CMI was innocent and reduce the damages as it finds just. *See* 17 U.S.C. § 1203. Discovery evidenced that Defendants directly emailed over 16,710 emails directing the at least 14,840 persons that those emails reached to download the Pirated Product.

MI1:\109114\01\2C6Y01!.DOC\66024.0029

7

**ASSOULINE & BERLOWE, P.A.**
3250 Mary Street, Suite 308, Miami, Florida 33133 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

capable of limiting damages when it wanted to in the past. The statute unambiguously says that it should be read in light of the existing copyright case law. *See* 17 U.S.C. § 1201(c)(1-2). Nonetheless, the facts in *McClatchey* are distinguishable from the instant case. In this instance, each viewable performance, separately downloaded from Defendants' websites and Youtube pages, occurred at separate times and on separate occasions, and on demand at times of choosing of the downloader. Each download was controlled by, and actively induced by, the Defendants.[6]

### 2. The *McClatchey* Court's Analysis also Supports the Finding of Multiple Statutory Damages Awards Under the TPM Provisions of the DMCA in Each Instance Where an Infringed Work is Provided to a Third Party.

The *McClatchey* case did not involve technical protection measures, and the court therefore did not reach a holding on the statute regarding technical protection measures.[7] The DMCA provides that no person shall circumvent a technological measure that effectively controls access to a work. 17 U.S.C. § 1201(a)(1)(A). Furthermore, no person should manufacture, offer to the public, provide or traffic in any technology, product, service, device, or component that is primarily designed or produced for the purpose of circumventing a technological measure. § 1201(a)(2). The DMCA further states:

> At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for **each violation** of section 1201 in the sum of not less than $200 or more than $2,500 **per act of circumvention, device, product, component, offer, or performance of service,** as the court considers just."

---

[6] *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 915–916 (2005) (explaining how inducement from one broadcast message can create multiple violations of the copyright act).

[7] The *McClatchey* court stated in dicta that the absence of "per act" damages in the CMI portion of the DMCA damages section is intentional and should not be improperly read into § 1203(c)(3)(B) to provide multiple damages where they would be found under § 1203(c)(3)(A). *McClatchey,* 2007 WL 1630261 at *5.

MI1:\109114\01\2C6Y01!.DOC\66024.0029

8

**ASSOULINE & BERLOWE, P.A.**
3250 Mary Street, Suite 308, Miami, Florida 33133 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

§ 1203(c)(3)(A) (emphasis added).[8]

Fortunately, unlike the CMI portion of the DMCA, the case law is clearer for guidance relating to the availability for multiple awards for damages under this similar damages clause. *See Sony Computer Entertainment America, Inc. v. Divineo, Inc.*, 457 F. Supp. 2d 957, 958-67 (N.D. Cal. 2006) (awarding $3,750,200.00 in statutory damages for 10,000 violations plus attorneys fees). *See also Sony Computer Entertainment America, Inc. v. Filipiak*, 406 F. Supp. 2d 1068, 1069-75 (N.D. Cal. 2005) (holding that an award of $6,018,700.00 was reasonable, because § 1203(c)(3)(A) requires "a separate award of statutory damages for each" of the 7,194 estimated violations). "While this award of damages is substantial... it is both consistent with Congressional intent and necessary to discourage wrongful conduct . . . in what might otherwise appear to be a lucrative business." *Id.* at 1075-76. As Congress stated:

> [The DMCA] encourages technological solutions, in general, by enforcing private parties' use of technological protection measures with legal *sanctions* for circumvention and for producing and distributing products or providing services that are aimed at circumventing technological protection measures that effectively protect copyrighted works.

S. REP. 105-190, at 11 (emphasis added). *See also, Filipiak*, 406 F. Supp. 2d 1068, 1069-75 (applying *Fitzgerald Publ'g Co. v. Baylor Publ'g Co., Inc.,* 807 F.2d 1110, 1117 (2d Cir. 1986) to the DMCA by noting that "in determining the appropriate level of statutory damages under [the DMCA like] § 504(c) of the copyright act, courts may consider 'whether a defendant has cooperated in providing particular records from which to assess the value of the infringing

---

[8] "For anti-circumvention violations, the statute sets the figure from $200 to $2,500, as the court considers just. But those figures do not apply per violation of a single copyrighted work, as pertains to statutory damages under the [Copyright Act]. Instead, that amount within the statutory range can be compounded; the multiple applies 'per act of circumvention, device,

MI1:\109114\01\2C6Y01!.DOC\66024.0029

9

**ASSOULINE & BERLOWE, P.A.**
3250 Mary Street, Suite 308, Miami, Florida 33133 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

material produced'").

Congress also intended for the TPM violations to be found broadly whenever a technical measure is circumvented by another person's device, product, component, offer, or performance of service, etc. *See e.g. Davidson & Associates v. Jung*, 422 F.3d 630, (8th Cir. 2005) (holding that offering an alternate online service was a violation of TPM). Or as Congress explained:

> . . . if unauthorized access to a copyrighted work is effectively prevented through use of a password, it would be a violation of this section to defeat or bypass the password and to make the means to do so, as long as the primary purpose of the means was to perform this kind of act. . . This is roughly analogous to making it illegal to break into a house using a tool, the primary purpose of which is to break into houses.

S. REP. 105-190, at *11. Thus although the DMCA does not expressly define device, product, component, offer, or performance of service, it is clear that Congress meant for a violation to be found any time unauthorized access was provided to a protected work.[9] *Accord Goldman,* 2008

---

product, component, offer, or performance of service.'" 3 Melville B. Nimmer, et al., Nimmer On Copyright § 12A.13[B] (2006).

[9] The verbiage that Congress used was very broad. For example, "[D]evice" means "(t)hat which is devised, or formed by design; a contrivance; an invention; project; scheme; often, a scheme to deceive; a stratagem; an artifice," and "contrivance" in pertinent part as "(a) thing contrived or used in contriving; a scheme, plan, or artifice." In turn, "contrive" in pertinent part is defined as "(t)o devise; to plan; to plot ... (t)o fabricate ... design; invent ... to scheme ...." *Ernst & Ernst*, 425 U.S. at 199 n. 20, citing Webster's International Dictionary (2d ed. 1934)); 18 U.S.C. 1029(a)(e)(1-2) (defining broadly "access device" and "counterfeit access device"); "A computer disk encoded with a software program is a device within the meaning of 18 United States Code § 1953." *U.S. v. Mendelsohn*, 896 F.2d 1183 (9th Cir 1990); *Diane Von Furstenberg Studio v. Snyder*, 2007 WL 2688184, *4-5, (E.D.Va. 2007) (holding that in the context of a trademark that "contributory infringement occurs when the defendant either intentionally induces a third party to infringe . . . or supplies a *product* to a third party with actual or constructive knowledge that the *product* is being used to infringe") (emphasis added). *Size, Inc. v. Network Solutions, Inc.*, 255 F.Supp.2d 568, 573 (E.D.Va. 2003) (comparing products and services in a trademark infringement context and discussing the intent required for trademark infringement in relation to domain name registration).

MI1:\109114\01\2C6Y01!.DOC\66024.0029

10
**ASSOULINE & BERLOWE, P.A.**
3250 Mary Street, Suite 308, Miami, Florida 33133 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

WL 1630261, at *10. Each time a customer requests a video through a video-on-demand service, a service is offered, a copy is made, a copy is distributed, and the video is publicly performed and these acts are performed by the company providing the service. *Twentieth Century Fox Film Corp. v. Cablevision Systems Corp.*, 478 F. Supp. 2d 607, 617–22 (S.D. N.Y. 2007) (holding that when a consumer requests a video through a cable company's video-on-demand service, that it is the cable company that is: providing the service directly; making the unauthorized reproductions; making the unauthorized transmission; publicly performing the work; and, illegally distributing the work). Defendants' Youtube account operated no differently.

In this case, Defendants used "ripping" software to remove the restrictions and technical protection measures from Stockwire's Stockumentary. Defendants then converted the ripped Stockumentary into a format that permitted Defendants to edit and duplicate the Stockumentary, as otherwise prohibited by Stockwire's Technical Protection Measures. Defendants then edited the resulting video to remove all copyright management information, creating the Pirated Product.

Then, without Stockwire's control measures in place, Defendants cloned the Pirated Product for delivery on demand from persons that the Defendants solicited, creating the appearance that there was some association between Defendants and Stockwire. Each Pirated Product that was distributed was the equivalent of the initial Pirated Product that the Defendants produced from circumventing Stockwire's Technical Protection measures. The Content from the unmodified Stockumentary was only otherwise available through permission or license from Stockwire as content protected with Stockwire's Technical Protection Measures. In effect, for each person that Defendants provided access to the Pirated Product, they also provided access to

the protected Stockwire Stockumentary. Stockwire's rights were violated each time that the Pirated Product was downloaded (and copied into RAM at the server and then again at the download computer) and therefore copied, distributed, performed, etc.

The statutory damages provided by the DMCA are intended to be deterrent and punitive in nature, and therefore minimize the expense on the damaged party and the courts, particularly when the actual damages for a copyright violation can be difficult to quantify. This Court should uphold Congress' intent and find that there were at least the 11,767 violations of Stockwire's CMI and TPM as alleged in the Complaint and admitted by Defendants through default, or the greater amount determined through discovery.

### B. The DMCA's Purpose and Legislative History Supports Plaintiffs' Statutory Damages Calculation.

As discussed *supra*, Plaintiffs calculate statutory damages on a per download basis.[10] Plaintiffs' statutory damages calculation is not just rooted in the language of the DMCA and the case law interpreting the DMCA. Plaintiffs' statutory damages calculation is strongly rooted in the purpose and legislative history of the DMCA.

#### 1. The Purpose of the DMCA is to Prevent the Mass Piracy that is Possible in this Digital Age, by Affording Multiple Awards of Statutory Damages on a Per View/Per Download Basis.

The express purpose of Title I of DMCA is to prevent mass piracy. In the words of Congress:

> Due to the ease with which digital works can be **copied** and distributed worldwide virtually instantaneously, copyright owners will hesitate to make their works readily available on the Internet without **reasonable assurance that they will be protected against massive piracy.**

---

[10] Youtube calls downloads "Views."

MI1:\109114\01\2C6Y01!.DOC\66024.0029

12

**ASSOULINE & BERLOWE, P.A.**
3250 Mary Street, Suite 308, Miami, Florida 33133 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

S. REP. 105-190, at *8 (May 11, 1998) (emphasis added). [11] To accomplish this purpose, the DMCA was drafted for bringing "the U.S. copyright law squarely into the digital age and setting a marker for other nations who must also implement [the WIPO treaties]." S. REP. 105-190, at *2 (May 11, 1998) (referring to the World Intellectual Property Organization (WIPO) Copyright Treaty and the WIPO Performances and Phonograms Treaty (collectively the "WIPO Treaties")).

The motivation behind the WIPO treaties and the DMCA was to create a greater parity between the protection of bricks and mortar information goods, and their digital counterparts. In this regard, the Federal Circuit has stated:

> Congress crafted the anti-circumvention and anti-trafficking provisions . . . to bring copyright law into the information age. Advances in digital technology over the past few decades have stripped copyright owners of much the technological and economic protection to which they had grown accustomed. Whereas large scale copying and distribution of copyrighted material used to be difficult and expensive, it is now easy and inexpensive.

*The Camberlin Group, Inc. v. Skylink Technologies, Inc.*, 381 F.3d 1178, 1179 (Fed. Cir. 2004). The DMCA remedies this by shifting the risk of piracy to the pirates when they engage in prohibited behavior.

In other words, Congress' express intent was for the DMCA to encourage right holders to provide their works in a digital format protected by "technical solutions", by assuring those rights holders that there would be substantial "legal sanctions" against those who violate their copyrights. *Id.* at *11. Importantly, Congress was expressly aware of, and intent on remedying, the inherent vulnerability of digital media to "mass piracy" on the Internet.[12] Absent

---

[11] "The treaties will grant writers, artists, and other creators of copyrighted material global protection from *piracy in the digital age*." William J. Clinton, Statement by The President on Digital Millennium Copyright, 1998 WL 754861 (Oct. 28, 1998) (emphasis added).

[12] The DMCA was intend to "facilitate making available quickly and conveniently via the Internet the movies, music, software, and literary works that are the fruit of American creative

MI1:\109114\01\2C6Y01!.DOC\66024.0029

13

**ASSOULINE & BERLOWE, P.A.**
3250 Mary Street, Suite 308, Miami, Florida 33133 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

technical protection measures, the Internet has effectively made copyright pirates' overhead a nullity.[13]

Acknowledging the potential severe liability to online service providers, libraries, and other non-commercial and innocent parties, Congress intentionally carved out liability for qualifying persons and set the intent element for CMI violations, and downstream Technical Protection Measure ("TPM") violations extremely high.[14] In doing so, Congress also expressly adopted the holding in *MAI Sys. Corp. v. Peak Computer,* and the 'evolving' doctrines of direct, contributory, and vicarious liability as had been applied to copyright law. S. REP. 105-190, at

---

genius . . . by **setting strong international copyright standards**." S. REP. 105-190, at *8 (emphasis added). The adoption of the WIPO treaties through the DMCA was intended "give a significant boost" to the protection afforded creative works that are subject to piracy online. *Id.* at *65.

[13] *See e.g. Raymond Shih Ray Ku*, The Creative Destruction of Copyright: Napster and the New Economics of Digital Technology, 69 U. Chi. L. Rev. 263 (2002) (criticizing the economics of paying distributors for music when the Internet provides a channel for free distribution).

[14] Unlike copyright infringement which is a strict liability tort, some DMCA violations require that the defendant have culpable knowledge or intent to violate a copyright. For example, in order to be responsible for a third parties' marketing of a device, product, service, etc. that violates §§ 1201(a)(2)(c), or (b)(2)(c) a violator must have knowledge that device, product, service, etc. is for use in circumventing technological protection measures. To be a violator of the Copyright Management Information ("CMI") the defendant must "knowingly and with the intent to induce, enable, facilitate, or conceal infringement . . . provide [distribute, or import false CMI]" or "distribute, import for distribution, publicly perform works, copies of works, knowing that [the removed CMI] . . . will induce, enable, facilitate, or conceal an infringement . . ." §§ 1202(a), (b). Congress provided specific "safe harbor[s]" for qualified uses of copyright materials that could potentially otherwise violate traditional copyright law, or the DMCA. S. REP. 105-190, at 19-24 (generally discussing the safe harbors); *Id.* at 59-60 (explaining the modifications § 112 to carve out DMCA liability for qualified radio broadcasters); *Id.* at 30 (clarifying that Title I of the DMCA is not to alter the existing doctrines of contributory or vicarious liability for copyright infringement in connection with any technology, product, service, device, component or part thereof or affect the existing legal regime established in the Copyright Act and case law interpreting that statute).

MI1:\109114\01\2C6Y01!.DOC\66024.0029

14
ASSOULINE & BERLOWE, P.A.
3250 Mary Street, Suite 308, Miami, Florida 33133 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

*19, *56, fn. 26 (adopting *MAI Sys. Corp. v. Peak Computer*, 991 F.2d 511 (9th Cir. 1993), cert. denied, 114 S.Ct. 671 (1994)).[15]

Unlike § 504 of the Copyright Act, § 1203 expressly provides for multiple statutory damage awards for both §§ 1201 and 1202 violations. Moreover, viewed in the light of the legislative purpose of the DMCA, and the *MAI* case cited by Congress, it is clear that Congress drafted the DMCA to meet the U.S. obligations under the WIPO Treaties and provide significant *sanctions* to deter *mass* copyright infringement that could proliferate across the globe, at nearly the speed of light.

### 2. The Legislative History Supports the Plain Language of the CMI Damage Provisions of the DMCA which Provide for Damages for "Each Violation" of the Act.

It is clear that Congress meant the CMI statute to be read broadly, and the legislative intent is clear without altering the words of the DMCA as done by the *McClatchey* Court. Congress specified that damages are available for each CMI violation rather than each work violated, because it wanted to distinguish the DMCA damages for violations of CMI and TPM from the limitations imposed under § 504.[16] Precisely:

> At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages **for each violation** of [the Act] in the sum of not less than $2,500 or more than $25,000.

17 U.S.C. § 1203(c)(3)(B)(emphasis added).

---

[15] The *MAI* case cited by Congress clearly finds that the "loading of copyrighted [works] . . . into [computer] RAM creates a 'copy' of [those works] . . . in *violation* of the Copyright Act." *MAI Sys. Corp. v. Peak Computer*, 991 F.2d 511 (9th Cir. 1993) (emphasis added).

[16] Notably, when Congress has wanted to limit occurrences of damages in the past per work or on another basis it has done so expressly. *See e.g.* § 504(c)(2-3) (providing statutory damages for copyright infringement is limited per work); 15 U.S.C. § 1117(c)(1-2) (providing that the amount of statutory damages under the Lanham Act is anywhere between $500 and $100,000 per work infringed for non-willful infringement, and $1,000,000 per counterfeit mark.)

MI1:\109114\01\2C6Y01!.DOC\66024.0029

15

**ASSOULINE & BERLOWE, P.A.**
3250 Mary Street, Suite 308, Miami, Florida 33133 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

The CMI provisions of the DMCA are primarily directed at commercial violators -- not typical household Internet users. The Congressional committee enacting the DMCA distinguished "different degrees of online copyright infringement, from the inadvertent to the noncommercial, to the willful and commercial." S. REP. 105-190, at 52. By the legislature's own requirements, the knowledge and intent elements and behavior sanctioned in §§ 1201-1203 are directed at clear, intentional, and damaging commercial exploitation, which is the most deplorable behavior on the Committee's stated culpability spectrum. §§ 1201(a)(E)(2)(C), 1202(a-b).

Certainly, the intent element required for finding a CMI violation under the DMCA requires a high degree of culpable behavior. End users are not capable of violating the CMI as prohibited under the DMCA, absent some malignant commercial motive.[17] Thus, it is only for malicious commercial purposes, like those of the Defendants, that a person could actually violate the CMI provisions of the DMCA. The statutory damages are calculated to deter, and sanction this deplorable conduct, so that it would not make economic sense for commercial enterprise to violate CMI for commercial purposes. Criminal violations impose $500,000.00 penalties in addition to imprisonment for first time offenders.

If *McClatchey* were to stand for the proposition that statutory sanctions for CMI are limited to between $2,500.00 and $25,000.00 for all copies distributed, then there would not be a sufficient penalty to compensate rights holders, or deter *mass piracy*, particularly where commercial interests are involved. However, if a commercial violator knows that the risk of statutory *sanctions* is multiplied by each violation, as expressly provided in § 1203, then that

---

[17] Congress made it clear that no user identifying information would be considered copyright management information or technical protection measures. 17 U.S.C. § 1205.

MI1:\109114\01\2C6Y01!.DOC\66024.0029

16

**ASSOULINE & BERLOWE, P.A.**
3250 Mary Street, Suite 308, Miami, Florida 33133 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

commercial violator will seriously evaluate the risks and benefits of removing CMI in an attempt to conceal an infringement. Thus, the DMCA makes the otherwise low risk, and lucrative, business of piracy uneconomical.

Here, where the evidence supports, and Defendant has conclusively admitted through default and discovery that there were 11,786 independent distributions of Stockwire's copyright multimedia presentation, the Court should find statutory damages as a matter of law for each instance where Defendants provided the Pirated Product to a third party.[18]

### III. CONCLUSION

The *McClatchey* case does not prohibit an award of statutory damages for *each* unlawful Stockumentary download, which in this instance is at least 11,786 separate violations. In fact, the *McClatchey* Court specifically found it need not make such a determination in that matter. Moreover, additional case law, cited *supra*, supports an award of statutory damages for the 11,786 § 1201 and § 1202 violations committed by the Defendants.

Furthermore, when Congress enacted the DMCA, it did so knowing that it had to combat the efficacy of the Internet in distributing digital products. Where in the past the acts of physically replicating and sending 12,000 copies of a video or book to different recipient would have required a person to purchase expensive equipment and media, and hand stamp and address 12,000 envelopes, today the process can be automated by computers. Armed with a computer and an Internet connection, and the tools to rip off technical locks, an infringer can accomplish in less than a few minutes what it once would have taken a large cooperative days, months, or years

---

[18] Notably, there is more overwhelming evidence that Defendants provided the Pirated Product to well over 11,786 persons. *See* Documents Produced by Google, Inc. [DE 80-23]. *See* Decl. David Smith Records Custodian for Constant Contact [DE 80-12] at 2, ¶¶ 8-9, 19 (CC-016). *See* Amended Complaint [DE 3]. *See* Decl. A James [DE 53-3]. *See* Second Decl. A. James [DE 81] at 2-3 ¶ 10. *See* Second Req. for Adm. to Def. J. Lebed [DE 80-3] at 7 ¶ 31.

MI1:\109114\01\2C6Y01!.DOC\66024.0029

17
**ASSOULINE & BERLOWE, P.A.**
3250 Mary Street, Suite 308, Miami, Florida 33133 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

to accomplish.

The DMCA provides the legal framework to make the incentives authorized under U.S. Const, Art. I, § 8, cl. 8 relevant in this digital age, and in this millennium. It does this by encouraging rights holders that contribute to the public good, to bear the costs of identifying and technically protecting their works, but provides harsh penalties when those measures are wrongfully violated.

WHEREFORE, Stockwire Research Group, Inc. respectfully requests that this Court find that were multiple violations, of its exclusive rights under § 1201 and § 1202 violations of its exclusive rights for purposes of calculating statutory damages under § 1203.[19]

Dated: July 17, 2008                    Respectfully submitted,

**ASSOULINE & BERLOWE, P.A.**
3250 Mary Street, Suite 308
Miami, Florida 33133
Telephone: 305-567-5576
Facsimile: 305-567-9343

By: *s/Peter A. Koziol*
Peter E. Berlowe (FBN 143650)
peb@assoulineberlowe.com
Peter A. Koziol (FBN 0030446)
pak@assoulineberlowe.com

*Attorneys for Plaintiffs*
*Stockwire Research Group, Inc., and Adrian James*

---

[19] In the event that this Court finds that there were less than 1,000 violations supporting statutory damages, Stockwire and Adrian James respectfully requests that Court provide maximum statutory damages for Counts II and III and reserve ruling on Damages for Counts IV-X so that Stockwire can put forth full evidence of its actual damages.

MI1:\109114\01\2C6Y01!.DOC\66024.0029

18

**ASSOULINE & BERLOWE, P.A.**
3250 Mary Street, Suite 308, Miami, Florida 33133 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

*Stockwire Research Group, Inc. v. Lebed, et. al.*
Case No.: 07-22670 CIV-SEITZ/MCALILEY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via the methods referenced below this day July 17, 2008 on all counsel or parties of record on the service list indicated below:

## SERVICE LIST

*Stockwire Research Group, Inc. v. Lebed, et. al.*
**CASE NO.: 07-22670 CIV-SEITZ/O'SULLIVAN**
**United States District Court, Southern District of Florida**

**U.S. Mail and Email**

**Defendant Jonathan Lebed**
lebed316@aol.com
49 Ivy Place
Wayne, New Jersey 07470
Telephone No.: (862) 377-1768

**Defendant Lebed Biz, LLC**
c/o Jonathan Lebed
49 Ivy Place,
Wayne, New Jersey 07470
Telephone No.: (862) 377-1768

**Defendant Pigasa, Inc.**
c/o Jonathan Lebed, Registered Agent
26 Sunset Terrace
Cedar Grove, NJ 07009
Telephone No.: (201) 321-3976

**Defendant, Jonathan Lebed**
101 20th Street, #2707
Miami Beach, FL 33139-1903

By:     *s/Peter A. Koziol*
             Peter A. Koziol

19
**ASSOULINE & BERLOWE, P.A.**
3250 Mary Street, Suite 308, Miami, Florida 33133 • Telephone: 305-567-5576 • Facsimile: 305-567-9343